IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| SUNOCO, INC.; SUNOCO, INC. (R&M) | : | |
| | : | |
| | : | |
| | : | |
| V. | : | C.A. NO. 04-4087 |
| | : | |
| | : | |
| | : | |
| ILLINOIS NATIONAL INSURANCE | : | |
| COMPANY | : | |


WEINER, J.                                                    July 27, 2005


## <u>MEMORANDUM OPINION AND ORDER</u>


Introduction.

    Sunoco, Inc. and Sunoco, Inc. (R&M) (collectively Sunoco) brought this

declaratory judgment action against their insurer Illinois National Insurance Company

(INI) seeking a declaration that, pursuant to a manuscript insurance policy issued by

INI to Sunoco, INI has a duty to defend Sunoco against, and reimburse Sunoco for

defense costs in connection with, some seventy lawsuits that have been lodged

against the company within the policy's Claim Reporting Period.  The underlying

suits all concern ground water contamination from methyl tertiary-butyl ether ("MtBE"), a gasoline additive product manufactured by Sunoco.  Presently before the court are two motions: a motion by INI to compel discovery and a motion by Sunoco for partial summary judgment.   INI's motion seeks information regarding the negotiation, execution, issuance, countersignature and delivery of the INI policy. More significantly, INI seeks the discovery garnered in the underlying lawsuits for which Sunoco seeks coverage.[1]  Sunoco's motion seeks a declaration that it has satisfied the policy's self-insured retention of $5.25 million and that INI has now become liable to pay its defense costs in the cases.

Under the policy, INI is obligated to defend or reimburse Sunoco's defense costs after Sunoco has paid a $250,000 per occurrence self-insured retention amount and a $5 million aggregate self-insured retention amount.   Sunoco has expended more than $5 million aggregate dollars in defending the suits.  It has not, however, expended more than $250,000 in every one of the underlying cases.[2]  The issue which controls Sunoco's motion may be stated rather simply: Are all of the underlying MtBE cases to be deemed one "occurrence" under the manuscript policy's

---

[1]It is undisputed that Sunoco has provided INI, as well as the court, with copies of all of the complaints in the underlying actions.

[2]See Declaration of Stephen M. Metzler at ¶ 5-10.

2

self-insured retention, or does each case constitute a separate "occurrence," meaning

that Sunoco would be required to pay the $250,000 SIR in every case.  As all of the

underlying law suits allegedly arise from the same proximate cause, we hold they are

but one "occurrence," as a matter of law.


The Policy and its Terms.[3]

> The manuscript policy provides that INI:
>
> will have the right and duty to defend any insured against
> a suit seeking damages for bodily injury, property damage,
> advertising injury or personal injury.  However, we will
> have no duty to defend any insured against a suit seeking
> damages to which this insurance does not apply."

The policy provides for $50 million in coverage for "bodily injury"[4] and "property

damage"[5] caused by an "occurrence."  An "occurrence" is defined as "an accident,

including continuous or repeated exposure to substantially the same general harmful

conditions."  The policy's Claim Reporting Period clause limits the policy coverage

---

[3]All undisputed facts are taken from the summary judgment record, which includes various affidavits from counsel, and employees of Sunoco, INI and the insurance broker that arranged the coverage.

[4]Bodily injury is defined as "physical injury; sickness; or disease sustained by a person and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time."

[5]Property damage is defined as "physical injury to tangible property, including the resulting use of that property."

to bodily injury or property damage that occurred between January 1, 1947 and

December 31, 1992, raised in claims brought against Sunoco and reported to INI

between March 19, 1999 and March 19, 2009.

The policy coverage is also limited by a Self-Insured Retention ("SIR"),

which was Endorsement No. 4 to the policy.  It provides:

> In consideration of the premium charged, it is agreed that
> the Limits of Insurance for each of the coverages provided
> by this policy will apply excess of a $250,000 Self-Insured
> Retention (hereinafter referred to as the Per Occurrence
> Retention Amount) and an additional Self Insured Reten-
> tion of $5,000,000 (hereinafter referred to a (sic) the
> Aggregate Retention Amount.)
>
> The Per Occurrence Retention Amount:
>
> (a) shall apply only to occurrences covered under this
> policy;
> (b) shall apply *separately to each such occurrence* arising
> out of such occurrence, and
> (c) shall include all amounts under the Supplementary
> Payments section of the policy.
>
> The Aggregate Retention Amount
> (a) shall apply only to occurrences covered under this
> policy; and
> (b) shall apply to amounts *which are greater than* the Per
> Occurrence Retention Amount; and
> (c) shall not include any amount within the Per Occurrence
> Retention Amount.

(emphasis added).[6]   Under the policy language, amounts expended can only be charged against the Aggregate Retention only if the Per Occurrence Retention is first satisfied.  Thus, if the underlying cases are deemed to be separate occurrences the Aggregate Retention will not have been satisfied, since Sunoco has not yet expended more than the Per Occurrence Retention in every suit.[7]

The named insured on the policy is Sunoco, Inc., whose mailing address is listed as Rochester, New York.  The policy producer is listed as Aon Risk Services,

---

[6]"Supplementary Payments" include defense and investigation costs.

[7]We note that the Policy contains an exclusion labeled "Pollution."  It provides that the policy does not apply to injuries "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants at any time."  However, the exclusion does not apply to damage

> which occurs away from premises you own or rent and
> arises out of your product in conjunction with the product-
> completed operations hazard, provided:
> A.     An actual discharge, dispersal, release or escape of
>        pollutants takes place other than from a location
>        used for disposal of waste or other material . . . .

The Products-Completed Operations Hazard clause in turn provides coverage for injury "occurring away from premises you own or rent and arising out of your product or your work . . . ."  INI makes no argument that coverage is excluded based on the Pollution exclusion.  Sunoco avers without any discussion that the pollution exclusion does not apply because the MtBE suits all allege damage to groundwater, which falls within the grant of coverage.  We note only that, even though some of the underlying complaints – the hotel case for example – allege that Sunoco was the *owner* of the gas stations that were the source of the MtBE that escaped into the groundwater, none of the claims for which Sunoco seek coverage concern Sunoco's own property damage.  Thus, the exclusion does not on it face apply.

Inc. of New York.  The policy was underwritten and counter signed in New York.

At the time the policy was purchased, Sunoco's legal and insurance departments were

located in Philadelphia.  The decision to purchase the policy was made in Philadel-

phia.  Representatives of INI and Aon traveled to Philadelphia to negotiate the terms

and review Sunoco historic operations.  Sunoco manufactured MtBE at Marcus Hook,

Pennsylvania.  Aon delivered the policy to Sunoco in Philadelphia and billed Sunoco

in Philadelphia, where payment was authorized.  It is undisputed that the policy

contains no choice of law provision.


The underlying suits.

        The underlying suits, many of which have been consolidated in the

United States District Court for the Southern District of New York as MDL 1358,

generally contend that Sunoco is liable, along with other manufacturers and

distributors of MtBE, for bodily injury and property damage because MtBE was

defectively designed and constituted a dangerous product, and because Sunoco

breached a duty to warn of the dangers of MtBE.   MtBE is a gasoline additive first

marketed in 1979, and designed to boost octane levels in higher grades of gasoline.

The plaintiffs allege injuries by contamination of ground water or the reasonable

expectation or fear of such contamination, which will interfere with the enjoyment of

their property and cause them bodily injury from drinking contaminated well water. See MDL 1358 Master Complaint (appended as Exhibit B to the Declaration of Stephen M. Meltzer).

Not all of the cases allege the same types of injuries and causalities, however.[8]  For example a case pending in the Court of Common Pleas for Philadelphia styled West Hazelton Hospitality, L.P. v. Sunoco, Inc., (No. June 2003 - 3652) asserts that alleged MtBE contamination was the proximate cause of West Hazelton's failure to conclude a hotel development.  The various cases allege contamination in different geographic areas, some were alleged to have resulted from leaking underground storage tanks at gas stations, others by accidental spills from pipelines. See MtBE Class Litigation, 209 F.R.D. at 337.  Sunoco's liability in the cases stems from its roles in the MtBE supply chain, including manufacturer, distributor, marketer, supplier, and manager of underground storage tanks.  The nature of the plaintiffs' alleged harms include bodily injury, emotional distress, environmental remediation, property damage, contaminated aquifers, contaminated ground water,

---

[8]Sunoco itself has successfully argued against certifying a class action in the Southern District of New York on commonality and typicality grounds.  In re Methyl Tertiary Butyl Ether Products Liability Litigation, 209 F.R.D. 323 (S.D.N.Y. 2002) (hereinafter referred to the MtBE class litigation).

and public nuisance.  The plaintiffs themselves also vary.  While most are individuals, there are also claims made by governmental entities.

Choice of Law.

Sunoco argues that Pennsylvania substantive law applies to the parties' dispute, while INI argues that New York law applies.  To determine which state's substantive law governs, we employ the choice of law rules of the our home jurisdiction, Pennsylvania.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941).  Under Pennsylvania choice of law rules, an insurance contract is governed by the law of the state in which the contract was made.  J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 360 (3d Cir. 2004) (citing Crawford v. Manhattan Life Ins. Co., 208 Pa.Super. 150, 221 A.2d 877 (1966)).  "An insurance contract is 'made' in the state in which the last act legally necessary to bring the contract into force takes place."  Crawford, 221 A.2d at 880.  "In most cases, the last act is delivery of the policy to the insured and the payment of the first premium by him.  J.C. Penny at 361 (citing Ruhlin v. N.Y. Life Ins. Co., 106 F.2d 921, 923 (3d Cir. 1939)).  As the summary judgment record is undisputed that the last act was the delivery of the policy, and it was delivered by Aon to Sunoco in Philadelphia, we find that Pennsylvania's choice of law rule requires that Pennsylvania law apply to the dispute.

INI's Motion and the Four Corners Doctrine.

In its motion to compel, INI seeks all documents concerning the underlying suits including all pleadings, defense costs incurred or estimated for each suit, amounts of damages alleged, settlements and all documents related to Sunoco's exhaustion of the self-insured retentions. It also seeks all of Sunoco's documents regarding the negotiation, purchase and placement of the INI policy, as well as exhaustion of the self-insured retentions. Finally, it seeks the discovery materials from the underlying cases. INI argues that Sunoco's refusal to provide any discovery has denied it the opportunity to discover essential fact issues surrounding whether Sunoco has exhausted the self-insured retention, and thus the court cannot properly determine INI's duty to defend. Since, under Pennsylvania law, interpretation of the policy is a matter of law, and the scope of an insurer's duty to defend is determined by the four corners of the underlying complaints, we find no impediment to addressing the summary judgment motion.

Under Pennsylvania law, an insurer's duty to defend an action is measured, in the first instance, by the allegations in the underlying complaint. Gene's Restaurant, Inc. v. Nationwide Ins. Co., 519 Pa. 306, 548 A.2d 246 (1988). The interpretation of a policy is a matter of law properly resolved in a declaratory judgment action. Old Guard Ins. Co. v. Sherman, 866 A.2d 412, 416 (Pa.Super

2004). Thus the task of interpreting the policy is generally performed by the court rather than a jury, which must read the policy as a whole and construe it according to the plain meaning of its terms. Bateman v. Motorists Mutual Ins. Co., 527 Pa. 241, 590 A.2d 281, 283 (1991).

The duty to defend is a distinct obligation from the duty to indemnify. The duty to defend is broader. J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 626 A.2d 502 (1993). The duty to defend,

> *is fixed solely by the allegations in the underlying complaint.* It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend. The duty to defend is limited to only those claims covered by the policy. *The insurer is obligated to defend if the factual allegations of the complaint on its face comprehend an injury which is actually or potentially within the scope of the policy.*

Old Guard at 416-17 (quoting Erie Ins. Exchange v. Muff, 851 A.2d 919, 925 (Pa.Super. 2004) (emphasis in Old Guard)). This is the so-called "four corners" doctrine. Whether a claim potentially falls within a policy so as to trigger the duty to defend must be determined by examining the four corners of the underlying complaint. Thus we look only to the policy language and the allegations of the MtBE complaints to determine whether the duty to defend has arisen. To the extent that

INI's motion argues that the other information it seeks is relevant to the coverage decision, that contention has no merit under Pennsylvania law.

Determining when the duty to defend arises:  What constitutes an occurrence for purposes of the Self-Insured Retention?

Determining whether there is a duty to defend is a two-step process. First, we examine the policy and determine the scope of coverage.  Second, we examine the allegations of the underlying complaints to determine whether the allegations are within the scope of coverage.  Lucker Manufacturing v. The Home Ins. Co., 23 F.3d 808 (3d Cir. 1994).  As we stated earlier, the primary issue in the coverage dispute is whether all of the underlying MtBE cases should be deemed one "occurrence" under the policy language.  If they are, Sunoco has met its burden of demonstrating that the self-insured retention condition has been satisfied, since it only had to expend a single $250,000 per occurrence retention, in addition to the $5 million aggregate retention.  If the suits are each a separate occurrence, Sunoco has not met its burden.  Although it has expended more than the $5 million aggregate retention, it would  still be required to expend the $250,000 retention on each case.

A self-insured retention is in effect a large deductible.  An SIR, like a deductible or retroactive premium, represents the amount of loss for which the

insured is ultimately responsible before the coverage is triggered. Absent controlling policy language, the insurer's duty to indemnify is excess over the sum owed by the insured because of the self-insured retention. The same is true with respect to the payment of defense costs, unless the insurer has a duty to defend and that duty has been triggered under the terms of the policy, despite the existence of the retention. Under a retention policy, the insured assumes the obligation of providing itself a defense until the retention is exhausted. 2 Insurance Claims and Disputes 4th § 11:31 (citing Hormel Foods Corp. v. Northbrook Prop. & Cas. Ins. Co., 938 F.Supp. 555, 560 (D. Minn. 1996)). In this regard, the relationship between an insurer and its insured with a self-insured retention is similar to the relationship between a primary and an excess insurer. See Appleman, Insurance Law and Practice (Berdal ed.), § 4682 (excess insurance is routinely written with the expectation that the primary insurer will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted).

Accordingly, INI's duty to pay defense costs does not arise until the self-insured retention is exhausted, and the question of exhaustion turns on the meaning of "occurrence." The authorities recognize that there is some debate over whether a continuing course of conduct – like the marketing of MtBE – presents one or more than one occurrence. See Couch on Insurance 3d, § 126:31. Some courts take the

12

"causal approach" and look to see whether one or more than one cause is responsible for all of the injuries; others take the "pragmatic approach" and examine all of the circumstances to determine whether a single "occurrence" can be assigned to a series of events. Id. Some courts have employed a test that focuses only on the event which triggered liability, i.e, the act or acts of the insured which subjected it to liability, irrespective of the number of negligent acts. See 64 ALR4th 668, 680 (1988).

The Third Circuit has adopted the "cause theory" as the law of the Virgin Islands to determine the number of occurrences under an insurance policy. Under the cause theory, "[t]he general rule is that an occurrence is determined by the cause or causes of the resulting injury. . . . Using this analysis, the court asks if '(t)here was but one proximate cause which resulted in all of the injuries and damage.'" Flemming ex rel. Flemming v. Air Sunshine, Inc., 311 F.3d 282, 294-95 (3d Cir. 2002) (quoting Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56, 61 (3d Cir. 1982) (citations and quotations omitted in Flemming)); see also Air Products and Chemicals, Inc. v. Hartford Acc. & Indem, 707 F.Supp. 762, 772 (E.D.Pa. 1989) (one "proximate, uninterrupted, and continuing cause"). "If cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, courts adopting the "cause" analysis uniformly find a single

occurrence or accident." <u>Flemming</u> at 296 (quoting <u>Welter v. Singer</u>, 126 Wis.2d 242, 376 N.W.2d 84 (Wis. App. 1985).

Cause analysis appears to be the law of Pennsylvania.  In <u>Union Carbide Corp. v. Travelers Indem. Co.</u>, 399 F.Supp. 12 (W.D.Pa. 1975), the court held that a single accident occurred when the insured, Neville, allowed a contaminant to remain in a chemical it sold, resulting in a single coverage limit for the insurer's liability. The chemical was sold to a manufacturer who in turn produced a product used by others to  manufacture shoes.  The contaminant caused "an intolerable stench" causing consumers to reject the shoes, leading to suits by consumers, retailers, wholesalers and manufacturers.  These claims were settled by Neville and its primary carrier, Aetna.  <u>Id</u>. at 14.

Travelers, which was Union Carbide's excess carrier, argued that Aetna, was responsible for the entire loss, because the loss constituted a number of claims spread over several years and were entirely within Aetna's aggregate coverage limits. It asserted that the introduction of the contaminant was not the "accident."  Rather, th accident was what happened to the original claimant which gave him cause to bring his claim against the party next to him in the chain of commerce.  Aetna, not surprisingly, argued the "accident" was the sale of the defective chemical, for which its coverage was exhausted, triggering the excess coverage.

14

The court agreed with Aetna that there was only one accident. Since the word "accident" was intended by the policy to denote the cause of the loss, rather than the effect, the court concluded that each claim could not be a separate accident:

> We believe that the term "accident" in the policy must be construed in light of the hazard insured against. This is products liability coverage afforded to a manufacturer to cover any liability arising from negligence in the manufacture or a defect in the product. Because this manufacturer was dealing in bulk raw materials it is regularly foreseeable that any defect in the product or negligence in its manufacture would affect a large number of divers persons in the chain of distribution.

Id. at 17. The court applied the rule that "where one negligent act is the sole proximate cause there is but one 'accident' even though there are several resulting injuries or losses to various claimants. Under this rule, as applied to liability insurance policies, the word 'accident' is predicated on an occurrence which is the cause of the injury. It is employed to denote the cause rather than the effect." Id. at 18.

A similar conclusion was reached by the Third Circuit in Appalachian.[9] Liberty Mutual, although itself an insurer, was seeking indemnity for its own alleged

---

[9]Although the district court had determined that, under Pennsylvania's choice of law rules, Massachusetts law applied, the Third Circuit found it did not need to reach the choice of law issue on appeal because there was no true conflict between Pennsylvania and Massachusetts law. 676 F.2d at 60 n. 10.

acts of sex discrimination from its insurer, Appalachian.  The Appalachian policy was an umbrella package that covered Liberty for net losses up to $15 million, in excess of a $25,000 per occurrence retention.  The issue was whether each employee's class action discrimination claim was a separate occurrence, necessitating a separate retention.

Liberty argued that, for the purposes of determining coverage under an occurrence policy, an occurrence takes place when the wrongful act is committed, not when the complaining party is actually damaged.  As the damages paid to the female claimants were based on periods of employment during which the Appalachian policy was in effect, Liberty argued the occurrences did not precede the effective date of the policy.  The Court, applying the cause theory, agreed with the district court's finding that there was but one occurrence for purposes of policy coverage:  Liberty's discriminatory employment practice.  Therefore, the single occurrence, for purposes of coverage, was Liberty's adoption of its discriminatory practice.  The Court added,

> The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence.  As long as the injuries stem from one proximate cause there is a single occurrence.

Id., 676 F.2d at 61.[10]

Appalachian's cause analysis was later applied by Judge Huyett of this court in Air Products, a case involving the relative contributions owed by several insurers that had issued policies covering asbestos and welding gas exposure liability of the insured. Under endorsements in Air Products' policy with Liberty Mutual, Air Products was required to pay retrospective premiums ("retros") based on the claims made against Liberty's policies. The retros were calculated on the basis of "ratable incurred losses," which were limited under the various policies to between $50,000 and $200,000 per occurrence. Thus, as we must do here, Judge Huyett had to determine whether each asbestos or welding gas claim against Air Products was a separate occurrence in order to determine how many retros Air Products was responsible to pay.

He stated that,

> Appalachian's holding requires an inquiry into the cause of the claimants' alleged injuries. The causal inquiry supports the view that the claims in the underlying asbestos litiga- tion and the claims in the underlying welding litigation each arise from single occurrences – the continuing manufacture and sale by plaintiff of the products involved in each set of lawsuits.

---

[10]The Court went on to adopt an "effect" test to determine *when* the single occurrence took place. It was to be determined by reference to the time when the injurious effects of the occurrence took place. Id. at 61-62.

Air Products, 707 F.Supp. at 772-73.  Judge Huyett found that the claimants in the underlying litigation alleged injuries resulting from a single proximate cause – the continuing sale of plaintiff's products.  He determined further that the large per-occurrence ratable incurred loss limit supported the conclusion that the parties reasonably intended that the retros were to be calculated on the basis of a single occurrence – the manufacture and sale of the dangerous products.

As in Union Carbide, Flemming, Appalachian and Air Products, the claims faced by Sunoco all arise from one proximate cause common for all of the injuries and damage sustained by the underlying plaintiffs.  It was the manufacture, sale and distribution of the MtBE that is alleged to be the proximate cause of the underlying claims.  While the nature of the damage suffered by certain claimants may be unique from the group – the hotel case is good example – since they stem from the same proximate cause there is but a single occurrence.  This construction finds support in the policy language.  An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Repeated exposures to the same general harmful conditions are exactly what the underlying lawsuits generally claim.  Substantially all of them rely upon the facts that MtBE is harmful, and was placed in the stream of commerce by Sunoco, to state a claim based on a products liability theory.

Sunoco's situation in indistinguishable from those of <u>Union Carbide</u> and <u>Air Products</u>. Sunoco, like those alleged tortfeasors, was a "manufacturer [] dealing in bulk raw materials [where] any defect in the product or negligence in its manufacture would affect a large number of divers persons in the chain of distribution." Thus, we also apply the rule that where one negligent act is the sole proximate cause there is but one "accident" even though there are several resulting injuries or losses to various claimants.

Accordingly, we will declare in the order that follows that Sunoco exhausted its self-insured retention, and INI's duty to defend Sunoco arose, after Sunoco expended a total of $5.25 million dollars in total defending the underlying lawsuits alleging MtBE damages.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


SUNOCO, INC.; SUNOCO, INC. (R&M)    :
                     :
                     :
                     :
    V.             :    C.A. NO. 04-4087
                     :
                     :
                     :
ILLINOIS NATIONAL INSURANCE     :
COMPANY              :


## **ORDER**

    The motion of Illinois National Insurance Company to compel (#29) is

DENIED.

    The motion of Sunoco, Inc., and Sunoco, Inc. (R&M) for partial

summary judgment (#14) is GRANTED.

    Judgment is ENTERED in favor of Sunoco, Inc., and Sunoco, Inc.

(R&M) and against Illinois National Insurance Company on Count II of the plaintiffs'

complaint.

The court DECLARES that, pursuant to Policy Number GL 359 64 85, RA, Illinois National Insurance Company has a duty to defend Sunoco, Inc., and Sunoco, Inc. (R&M) against and reimburse them for defense and investigation costs in connection with lawsuits that have been brought against Sunoco, Inc., and Sunoco, Inc. (R&M) and reported to Illinois National Insurance Company within the Claim Reporting Period (March 19, 1999 to March 19, 2009) and which allege injury and damage on or before December 31, 1992, as a result of MtBE or MtBE containing products manufactured, sold, handled or distributed by Sunoco, Inc., and Sunoco, Inc. (R&M) (the "MtBE suits").

The court further DECLARES that Sunoco, Inc., and Sunoco, Inc. (R&M) have satisfied their self-insured retentions under said policy. Illinois National Insurance Company is obligated to reimburse Sunoco, Inc., and Sunoco, Inc. (R&M) for those amounts Sunoco, Inc., and Sunoco, Inc. (R&M) have paid in excess of $5,250,000, in connection with the investigation, defense and resolution of the MtBE suits. Illinois National Insurance Company's obligation will continue until it has paid the limits of its liability under the policy.

IT IS SO ORDERED.

_____
CHARLES R. WEINER