IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUNOCO, INC., SUNOCO, INC. (R&M), : | | CIVIL ACTION |
| formerly SUN COMPANY, INC. (R&M) : | | |
| : | | |
| V. : | | |
| : | | |
| ILLINOIS NATIONAL INSURANCE : | | |
| COMPANY : | | NO. 04-4087 |

MEMORANDUM

**Padova, J.**                                                                                                    **August    , 2007**

I. INTRODUCTION

Presently before the Court in this insurance coverage dispute between Plaintiffs Sunoco, Inc., and Sunoco, Inc. (R&M) (collectively "Sunoco") and Illinois National Insurance Company "INI") over the defense and indemnity of Sunoco's exposure for methyl teriary-butyl ether ("MtBE") environmental contamination, is a motion by Sunoco for summary judgment on the issue of whether certain expenses it incurred in mitigating and remediating a MtBE spill in Fort Montgomery, New York qualify as defense costs that are immediately reimbursable, or must be considered indemnity expenses that are not.  For the following reasons, we determine that costs paid by Sunoco to its consultant, Groundwater Environment Services, Inc. ("GES"), are indemnity expenses.

II.     BACKGROUND

The Court has already issued two orders related to this portion of the litigation. By a footnoted Order dated August 24, 2006, we determined that INI could raise objections to the propriety of Sunoco's defense costs claim because the Court, in previously concluding that Sunoco's self-insured retentions ("SIRs") had been satisfied, did not explicitly rule that all costs submitted on the record of that summary judgment motion related to defense and investigation. We also determined that INI did not waive all objections to the propriety of tendered costs by arguing that an even earlier ruling was final and appealable, because such objections were not necessarily inconsistent with abiding by its duty to defend and its waiver of affirmative defenses on the duty to defend issue. Accordingly, the motion was denied to the extent that it sought a ruling that the doctrines of res judicata and waiver precluded INI from raising any objections to the propriety of the tendered costs. We directed that (1) INI provide an index of costs tendered that it alleged were insufficiently documented, (2) the parties attempt to mediate the dispute, and (3) the parties conduct discovery on the issue. The parties then filed motions arising from the results of the discovery and the failure to resolve the issue of whether certain costs incurred by Sunoco related to MtBE contamination in Fort Montgomery, New York constitute defense costs that are within the terms of the Policy.

In our January 11, 2007 Memorandum and Order, we determined that the Fort Montgomery investigation and cleanup costs fell squarely within the coverage of the Policy. However, we held that those costs constituted *indemnity expenses* and not *defense costs*, and thus were not immediately reimbursable. We reasoned that, under the Policy, in order to constitute defense costs, the investigation and remediation expenses must have been incurred to defend Sunoco "against a *suit*

seeking damages for bodily injury, property damage, advertising injury or personal injury." (Policy p.6, emphasis added.)  At the time Sunoco conducted the investigation and incurred the remediation expenses, no Fort Montgomery resident or entity had yet filed a suit.  The only thing "pending" against Sunoco seeking damages was an administrative proceedings instituted by the New York Department of Environmental Conservation ("DEC"), which had sent Sunoco a Potentially Responsible Party letter ("PRP letter").

We rejected Sunoco's argument that a PRP letter qualified as a "suit" under the Policy, holding that its citation to the decision of the California Supreme Court in <u>Aerojet-General Corp. v. Transport Indem. Co.</u>, 948 P.2d 909 (Cal. 1997), was clearly inapplicable.  As that court later made clear in <u>Foster-Gardner, Inc. v. National Union Fire Ins. Co.</u>, 959 P.2d 265 (Cal. 1998), <u>Aerojet-General</u> involved site investigation expenses incurred *after* the insured had already been sued for the environmental contamination.  That was clearly not the case here.  The Fort Montgomery contamination was discovered on May 22, 2000.  GES began its work around this time and was already conducting site remediation when the DEC informed Sunoco that it was a potentially responsible party for the MtBE contamination on June 15, 2000.  Thereafter, GES conducted its subsurface investigation to determine the source and extent of the contamination pursuant to the PRP letter, and Sunoco began to provide potable water to residents, pursuant to the PRP letter, a subsequent DEC Consent Order, and GES's Remedial Action Plan for the site.  Sunoco was not sued until June 2003.  Thus, we held, June 2003 was the first time that INI's duty to defend arose with regard to the Fort Montgomery contamination. We granted Sunoco's motion to the extent that it sought a declaration that investigation and remediation costs arising from the Fort Montgomery, New York MtBE claims and suits may be indemnified, subject to Defendant's

continuing coverage defenses. We denied the motion to the extent that it sought a declaration that said costs are immediately payable to Sunoco, or attributable to its SIRs, as part of INI's duty to defend.

Following our January 11, 2007 Order, Sunoco filed a motion for "clarification," arguing that under its interpretation of the Aerojet holding and our rationale, Sunoco was entitled to payment of the sums it paid to GES after June 2003 because once the first Fort Montgomery lawsuit had been filed the GES expenses became defense costs. We declined to address the issue in that procedural posture, directing Sunoco in an Order dated February 6, 2007, to file a Rule 56 motion after conducting discovery. The pending motion then followed.

III.   SUMMARY JUDGMENT STANDARD

A court may grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Technologies, Inc., 78 F.Supp. 2d 402, 407 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n. 11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993)). The Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

IV.   THE POST-JUNE 2003 GES EXPENSES

The current motion argues that all expenses Sunoco incurred *after* the first lawsuit was filed in June 2003 are currently reimbursable as defense costs under the rationale of Aerojet, even though they are arguably no different in kind from the types of expenses we previously determined were indemnity expenses, i.e., expenses to mitigate the impact of Sunoco's activities by providing bottled water and water filtration systems to affected homeowners, and remediating the contamination at the site.

    A.   UNDISPUTED FACTS

The parties' statements of material facts demonstrate the following facts are not disputed.

1. Sunoco has been sued by more than one hundred Fort Montgomery residents in four lawsuits.

2. Sunoco has defended the suits through its in-house counsel, outside counsel, and in-house hydro geologists.

3. Sunoco retained GES to provide services in connection with the Fort Montgomery remediation.

4. The work performed by GES can be generally categorized as follows:

a. Water quality management, including tasks related to developing an understanding of the nature and extent of the MtBE contamination. This includes data collection (monitoring and sampling to determine water quality) and data interpretation. Monitoring was conducted at residential wells, including those equipped with point of entry treatment ("POET") systems, sentinel wells, and other monitoring wells. The data was used to develop visualizations of the MtBE plume and to forecast movement of the plume over time. The visualizations were, according to Sunoco, part of the overall investigation at Fort Montgomery and improved understanding of the data being acquired through the monitoring efforts.

b. Water remediation, including tasks intended to mitigate the MtBE contamination such as operating and maintaining the POET systems, and the design, installation, operation, and shut-down of remedial systems. GES prepared and submitted various reports to the DEC, participated in public meetings and responded to comments received in the public comment period.

c. POET system installations.

d. Supplying bottled water.

e. General consulting services designed to assist Sunoco in it efforts to identify potentially responsible parties by reviewing governmental records, reviewing newspaper articles, communicating with government officials, and working with Sunoco's outside counsel to research and interpret data and documents related to the Fort Montgomery investigation and remediation.

5. Sunoco paid GES $1,383,593.40 for the work it performed on the Fort Montgomery project from June 10, 2003 (the date the first lawsuit was filed) to the date the pending motion was filed.

INI disputes the characterization of the GES expenses as defense costs. It disputes that the groundwater testing expenses, POET systems expenses and bottled water expenses incurred after the

filing of the lawsuits were incurred by Sunoco *in response to* the lawsuits. INI asserts that the work GES performed was done in response to the ongoing DEC requirements under the PRP letter and subsequent Consent Order, and asserts that Sunoco has not identified any GES billings for work in the private party lawsuits. Looking in detail to the summary judgment record, we find that the characterization of the water quality management, water remediation, POETs, and bottled water expenses as defense costs is clearly incorrect. In addition, while some of the general consulting services expenses *may* constitute defense costs because they include litigation support, nothing in GES's billing records segregates these discrete functions so as to permit us to award those expenses now.

      B.    SUNOCO'S SUMMARY JUDGMENT SUBMISSIONS

Sunoco submits numerous emails and memoranda sent by GES personnel to each other, as well as to Sunoco's lawyers, as the basis for its contention that all post-June 2003 GES billings are defense costs. While the emails raise inferences that can both support and dispute whether GES was doing legal defense support in connection to the privately filed lawsuits, Sunoco's submissions do not establish the absence of factual issues.

1. The first email, dated June 19, 2003, an internal email between GES employees, states that GES personnel were not going to be involved as experts in litigation support efforts, but would be utilized as fact witnesses. Thus, personnel should be expected to be deposed. (Pl. Ex. A at FTM0172048.)

2. Other emails clearly relate to functions associated with the DEC proceedings. See Pl. Ex. A at FTM0172049-50 (referencing DEC required public meetings and DEC required well testing).

3. An internal email dated November 11, 2003, references Sunoco's counsel and relates that counsel has asked GES to summarize its research and observations for use by a potential expert witness to

be hired by outside counsel. (Pl. Ex. A at FTM0172187.)

4. Internal emails dated in January 2006, reference GES' efforts to communicate with homeowners regarding their POET systems. (Pl. Ex. A at FTM0172293-971.)

5. Internal emails dated July 2005, reference counsel's request to have GES estimate the cost of connecting affected homeowners to the municipal water supply, as well as creating a map to show those homeowners participating in lawsuits. (Pl. Ex. A at FTM0173292.)

6. Emails dated December 2004, from GES to Sunoco's outside counsel reference letters from and to residents concerning their complaints over water quality and whether the problem was being caused by iron oxide. (Pl. Ex. A at FTM0174029-33.)

7. An email dated November 29, 2004, from Sunoco's hydrologist William Brochu to in-house counsel and outside counsel concerning water quality issues. (Pl. Ex. A at FTM0174043-44.) This email does not reference GES.

8. An email dated October 12, 2004, from GES to outside counsel concerning water quality complaints, enclosing GES' analytical results. (Pl. Ex. A at FTM01747177-82.)

9. A memo from Brochu to GES dated July 27, 2004, prepared at the request of outside counsel concerning the scheduling of work to be done by GES concerning the POET systems and bottled water supplies. (Pl. Ex. A at FTM0174329-30.)

10. A July 26, 2004 email from in-house counsel to Brochu and GES concerning legal advice that clearly references work to be done in connection with the DEC proceedings. (Pl. Ex. A at FTM0174345-46.)

11. A July 22, 2004 email from in-house counsel to GES, Brochu and outside counsel concerning a new odor complaint and asking whether analytical work should be performed. (Pl. Ex. A at

FTM0174350.)

12. A July 20, 2004 email from GES to outside counsel regarding scheduled sampling. (Pl. Ex. A at FTM0174369-75.)

13. An email string from May 2004 among GES, Brochu, and in-house and outside counsels regarding a "cheat sheet," i.e., a log of callers and their questions, to keep track of whether plaintiffs' lawyers are gathering information through their clients' contacts with the parties, to use during future discovery. (Pl. Ex. A at FTM0175042-48.)

14. A November 19, 2003 email from Brochu to GES regarding the additions to the GES map of homeowners that recently filed complaints. (Pl. Ex. A at FTM0175100.)

15. A March 14, 2004 draft memorandum from outside counsel to in-house counsel containing notes from a conference call with plaintiffs' lawyers, indicating that GES representative were present. (Pl. Ex. A at FTM0173728.)

Sunoco also submits Brochu's Declaration, dated February 20, 2007, which details the history of Sunoco's use of GES's professional services. He recounts that Sunoco was told by DEC that it was a PRP on May 22, 2000, and hired GES "to develop and conduct investigations to identify the source and extent to MtBE in the groundwater." (Brochu Decl. at ¶¶ 6, 7.) GES's work involved investigating whether wells had MtBE contamination, providing potable water to affected residents, implementing measures to reduce MtBE levels and thus mitigate Sunoco's potential liability, and assist Sunoco's overall defense of the eventually filed lawsuits. (Id. at ¶ 8.) He declares that the use of the POET systems and bottled water was to mitigate legal exposure. GES was tasked with installing the POET systems and maintaining them "according to a schedule approved by DEC." (Id. at ¶ 10.) GES's efforts also led to the discovery of another PRP, the Town Garage property. (Id. at

¶ 11.)

He declares that Sunoco has paid GES at least $1,383,593.40 for work it did in Fort Montgomery after June 10, 2003. He breaks down the total into the various categories of work detailed above:

| CATEGORY | | COST |
|---|---|---|
| Water Quality Management | | $488,467.98 |
|     Monitoring and Visualization | $288,622.85 | |
|     POET Sampling | $199,845.13 | |
| Water Remediation | | $612,490.57 |
|     System Wide Remediation | $322,571.86 | |
|     POET Treatment | $289,918.71 | |
| POET Installation | | $ 32,751.97 |
| General Consulting (PR/Legal Support) | | $116,411.25 |
| Bottled Water | | $133,471.63 |
|     TOTAL | | $1,383,593.40 |

He attaches schedules reflecting the amounts from GES's bills associated with each category but the bills do not segregate specific functions within each category, specifically within the general consulting category for which Sunoco has the best argument that GES was performing litigation support activities.

    C.    INI'S SUMMARY JUDGMENT SUBMISSIONS

INI responds with the affidavit of Stephen P. Murray, an analyst in the Environmental Claims Department. He states that INI has paid Sunoco $1.8 million in defense costs associated with the Fort Montgomery lawsuits, including costs billed by various environmental experts. He appends to his affidavit the invoices of outside counsel highlighting entries that INI has declined to reimburse because they are for time billed for work related to the DEC administrative matter. Because outside counsel frequently billed multiple tasks within a single entry, and some entries relate both to the

DEC proceeding and to the private party suits, Murray avers that it was not possible to calculate the precise amount counsel billed for work related to the DEC matter for such entries. He estimated that, of the $1.8 million total, $27,000 of the billings related to the DEC matter. He reached this estimate by dividing equally any entry that referenced both the DEC matter and work related to a private party suit and assigning one half of the total to the DEC matter.

INI has also submitted excerpts of the deposition of John Guttman of Sunoco's outside counsel Beveridge & Diamond, Sunoco's William Brochu, and Elizabeth Bowen of GES. Guttman testified that GES was responsible for undertaking the work involved with Sunoco's compliance with the DEC order, including filing periodic reports confirming that the work was being done consistent with DEC's schedule. (Ledly Affidavit. Ex. 2 at 94:11-22.) He conceded that the work done by GES, including water sampling, preparing site monitoring reports, conducting site visits, providing bottled water, and installing the POET systems, was done to fulfill Sunoco's obligations under the DEC order. Id. at 99:14-104:19.

Brochu provided key testimony from INI's perspective on the continuing nature of GES's work after the first Fort Montgomery lawsuits were filed. He stated in his deposition that "everything that we've done at that – at this location, at this project, has been in response to that initial proceedings [i.e., the DEC administrative proceeding]." (Ledly Affidavit. Ex. 4 at 18:24-19:2.) He also testified:

> Q. Are there any tasks that you did that you can identify that related specifically to a particular lawsuit?
> . . .
> A. Well, I think that our overall approach to the project, as I said just a few minutes ago, was to fulfill our obligation to comply with the applicable regulations from the DEC, but also to mitigate the damages that homeowners could eventually seek against us.

> In terms of specific items that relate to one or the other, I think it's more accurate to say that all of the activities we conducted served both purposes.

(Id. at 268:6-21.) He added, "It's difficult to parse out what was done in relation to a lawsuit and what was not." (Id. at 269:8-10.) He also conceded that the vast majority of the POET systems were installed prior to June 2003, stating,

> [W]ith respect to your specific focus on June 10, 2003 [the date the first lawsuit was filed], I think that I would just state that our approach to the overall Fort Montgomery project was to treat everybody the same and take every complaint and every situation as sincerely as we take all of them; and we tried to be consistent and treat everyone the same from day one regardless of whether or not there was a lawsuit filed at the time and whether or not we thought they could be a potential plaintiff.
> So I think that – whether or not a June 10th lawsuit existed I think is largely irrelevant in how we handled these POETs. It was all to mitigate a potential future damage.

(Id. at 305:24-306:16.) He also testified as to the types of work GES performed. Regarding the category of "general consulting," he testified that the category included a "range of different subtasks," including reporting to the DEC and the Orange County Health Department, communicating with local governments, conducting public meetings as required by the DEC consent decree, responding to Freedom of Information Act requests, reviewing coverage in local newspapers, preparing maps both for Sunoco's counsel and for government agencies, and data input and compilation. (Id. at 307:10-310:21.)

Elizabeth Bowen of GES testified that the chemical oxidation remediation process GES proposed to the DEC in April 2003 – before the lawsuits were filed – was the same remediation process it later implemented in March 2004 after the suits were filed. (Ledly Affidavit. Ex. 1 at 99:8-101:16.) The provision of bottled water and the installation and maintenance of the POET systems were proposed by GES in May 2003 in response to DEC comments to the original

Residential Well Management Plan submitted by Sunoco. (Id. at 106:7-111:4.) She testified that "from the time that I started working on the project, we operated almost under the assumption that at some point there will be legal action on the site." (Id. at 120:4-7.) The questioning continued:

> Q. So other than perhaps providing documents to more people to review, GES didn't do anything different in connection with the site after the litigations were filed than they did before?
> . . .
> A. I wouldn't say we didn't do anything different. It's not that we started to pay more attention to remediation.
>   We definitely had more tasks and different tasks to do, but our approach to the site and commitment to cleaning it up and Sunoco's commitment to, you know, preventing exposure to the residents didn't change because of the filing of the lawsuit.
> Q. My question really was directed to the on-site remediation itself.
>   Did GES take any remedial activities on the site after the initiation of the lawsuits that it was not already performing prior to those lawsuits?
> . . .
> A. In a timeline sense, yes, we did implement the chemical oxidation system after the lawsuits were filed, but we proposed it before the lawsuits were filed.
>   So yes, thinks changed, but not as a result of the lawsuits being filed.

(Id. at 120:18-122:10.) She added that there was "no change in approach for management and maintenance of the POET systems" and the provision of bottled water to affected residents. (Id. at 124:23-125:23.)

IV.   DISCUSSION

   A.   The Foster-Gardiner / Aerojet-General test

Sunoco argues that the cost of all of GES's post-June 2003 activities are immediately reimburseable as defense costs because it retained GES to assist its efforts to defend itself in a "coordinated fashion" with in-house and outside counsel. It asserts that,

> GES assisted Sunoco's defensive efforts by enabling Sunoco to determine whether there was any MtBE damage at a particular residence, to investigate the nature and extent of the MtBE-related groundwater damage, to determine other potential sources

-13-

>   of the groundwater damage, to determine how best to respond to the allegations in the lawsuits, and to determine how best to avoid or mitigate potential liability to the Fort Montgomery plaintiffs. . . .  In a concrete way, GES's efforts are related and integral to the overall defense of Sunoco in the Fort Montgomery lawsuits.

(Pl. Mem. at 4-5 (internal citation omitted).)  Sunoco argues that cases we relied upon in finding that the PRP letter and Consent Order did not constitute a "suit" also support the conclusion that these same costs incurred between tender of the defense and the conclusion of the actual lawsuit are defense costs.  It cites Foster-Gardner and Aerojet-General for the proposition that after suit is filed, all such costs are properly defense costs because,

>   The duty to defend arises when the insured tenders defense of the third party lawsuit to the insurer.  Prior to the filing of a complaint, there is nothing for the insured to tender defense of, and hence no duty to defend arises.  It follows therefore that site investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur.  That is because the insurer does not yet have a duty to defend the insured.

Foster-Gardner, 959 P.2d at 285-86.  Foster-Gardner went on to hold that "site investigation expenses" would qualify as defense costs if the following requirements were met: 1) the site investigation was conducted within the temporal limits of the insurer's duty to defend; 2) the site investigation was a reasonable and necessary effort to avoid or at least minimize liability; and 3) the expense was reasonable and necessary for that purpose.  Id. at 285 (citing Aerojet-General, 948 P.2d at 922).  The Aerojet-General decision had defined defense costs as those costs "to avoid or at least minimize liability," while indemnity expenses are those that "resolve liability."  Id. at 923 n.13.  That decision holds that,

>   indemnification costs and defense costs are mutually exclusive:  the latter are expenses to avoid or at least minimize liability that arise before the insured's liability is established and apart therefrom; the former are expenses to resolve liability that arise after the insured's liability is established and as a result thereof.

Id. at 932 n.29.

      B.      Other states' standards

Other courts, however, have formulated quite different standards for deciding when environmental clean-up costs should be designated defense costs versus indemnity expenses, even after a lawsuit has been filed. The New Jersey Supreme Court summarized the competing policy considerations in General Accident Ins. Co. of America v. N.B. Fairclough & Son, Inc., 672 A.2d 1154 (N.J. 1996), when it opined that treating remedial investigation and feasibility study costs as indemnity expenses would tend to expedite the settlement and disposition of environmental clean-up cases, while treating such costs as defense costs would increase the overall amount of resources available for such clean-ups. Id. at 1161-62. The Fairclough court adopted, in a case where the policy limited indemnity benefits but not defense costs, a presumption that government mandated costs are indemnity costs to be allocated to indemnity provisions of the policy, but allowing a policyholder to rebut that presumption by showing that the insurance company would derive an unjust benefit from such an allocation if it would relieve the insurance company of an expense that it would otherwise have incurred under its obligation to defend. Id. at 1162. See also Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co., 177 F.3d 210, 225-26 (3rd Cir. 1999) (holding, in light of Fairclough, that disadvantaged parties must have opportunity to rebut presumption that government mandated clean-up costs were indemnity costs).

Other courts have attempted to set brighter lines. See e.g., Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 738 (Minn. 1997) (en banc) (holding that certain "dual purpose" investigation and compliance costs incurred as a result of state agency's "Request for Response Action" were properly designated as defense costs because they were reasonably necessary either to defeat

insured's liability or to minimize scope or magnitude of that liability); Endicott Johnson Corp. v. Liberty Mutual Ins. Co., 928 F.Supp. 176, 183-84 (N.D.N.Y. 1996), appeal dismissed, 116 F.3d 53 (2d Cir. 1997) (while noting that the law was "jumbled," treating remedial investigations as defense costs and feasibility studies as indemnity costs, and applying equitable allocation for costs not easily classified); Fireman's Fund Ins. Companies v. Ex-Cell-O Corp., 790 F.Supp. 1318, 1338 (E.D. Mich. 1992) ("defense costs include not only those reasonable and necessary costs to defeat or limit liability, but also those costs, including consulting fees, that are reasonable and necessary to limiting the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government"); Gelman Sciences, Inc. v. Fireman's Fund Ins. Cos., 455 N.W.2d 328 (Mich. App. 1990) (rejecting insured's argument that costs of installing sewers and connecting private parties to city water system after contaminating private water supply were defense costs because they were incurred voluntarily to mitigate future claims for injuries: "defense costs are monies expended to develop and put forth a theory that the defendant is not liable or only partially liable for the plaintiff's injuries . . . [p]reventative measures are cost effective and commendable, but in this case, they are indemnification damages not defense costs").

      C.     Foster-Gardiner / Aerojet-General does not apply

We have not found – and the parties do not cite – any similar decisions applying Pennsylvania law. We previously determined that, under the public policy of Pennsylvania, a general liability insurance policy must be construed as covering an insured's costs for proactively attempting to mitigate and minimize its future liability. We stated, however, that such costs "are not 'defense costs.' They are indemnity expenses subject to INI's continuing reservation of rights." Sunoco, Inc. v. Illinois Nat'l. Ins. Co., No. Civ. A. 04-4087, 2007 WL 127737, *3 (E.D. Pa. Jan. 11, 2007). We

went on to elaborate, with a great deal of citation to the body of case law, that an administrative proceeding such as that leading to the DEC's issuing the PRP letter and the subsequent Consent Order cannot be considered to be a "suit" as the term in used in the INI policy. We engaged in that discussion to discount the possibility that the GES's work could qualify as defense costs associated with the DEC proceedings because, while INI has waived its affirmative defenses vis-a-vis the Court's ruling on defense costs, it had not waived its affirmative defenses on indemnity. Id. at *7. In that discussion, we distinguished the holding in Aerojet-General – the principle authority upon which Sunoco relied – stating the "holding in Aerojet-General is clearly inapplicable. As the Foster-Gardner decision stated, Aerojet-General involved site investigation expenses incurred *after* the insured had already been sued for the environmental contamination. That is clearly not the case here [because, at the time Sunoco was arguing that the GES expenses that pre-dated June 2003 were defense costs]." Id. at *10 (emphasis in original).

Sunoco's reliance in the motion *sub judice* on Aerojet-General and Foster-Gardner to now argue that the post-June 2003 GES expenses can constitute defense costs ignores our initial determination that efforts "undertaken by the insured to *mitigate* its liability to third parties" are indemnity expenses. Id. at *3 (emphasis added). It also glosses over a clear distinction between the expenses at issue in Aerojet-General, "site investigation expenses," and the remediation and mitigation expenses involved here.[1]

---

[1] While throughout its brief Sunoco refers to its mitigation and remediation expenses as "investigation costs" to make them more neatly fit into the Foster-Gardiner / Aerojet-General rubric, this has its own problems under the Policy language that Sunoco, as the moving party, has not addressed. The policy language regarding investigation costs provides that *INI* may, at its "discretion investigate any occurrence or offense and settle any claim or suit that may result." Another clause adds that "with respect to any claim [INI] investigate[s]" it shall reimburse expenses paid by Sunoco "at our request to assist us." Sunoco makes no showing that INI ever requested it to investigate the

D.       Applying the New Jersey presumption

We find that the New Jersey presumption – that mandated clean-up costs are indemnity costs to be allocated to indemnity provisions of the policy, but allowing a policyholder to rebut that presumption by showing that the insurance company would derive an unjust benefit from such an allocation if it would relieve the insurance company of an expense that it would otherwise have incurred under its obligation to defend – should apply and that Sunoco has not demonstrated its entitlement to summary judgment on this record. Sunoco, as the moving party, presents no factual basis that would rebut the presumption that the expenses associated with GES's work to remediate the site and mitigate liability were indemnity expenses. We find no basis for determining that INI derived an unjust benefit from this allocation, given our determination that expenses incurred pursuant to the DEC PRP letter and Consent Order cannot qualify as defense costs.

The fortuity of having a private party lawsuit filed against it during the time period in which it was paying GES to perform its environmental clean-up responsibilities, does not alter the fact that the efforts thereafter continued to be taken in response to Sunoco's responsibilities under the Consent Order. The proposition that the filing of the first suit transformed the Consent Order activities from indemnity expenses into defense costs is at odds with the summary judgment record that establishes that most of the work done by GES, including water sampling, preparing site monitoring reports, conducting site visits, providing bottled water, and installing the POET systems, was done to fulfill Sunoco's obligations under the DEC consent order to remediate the site and mitigate the effects suffered by the Fort Montgomery residents.

---

MtBE contamination. It also makes no argument that, as an insured with a self-insured retention, it had the right under the policy to do such an investigation without consulting with or receiving permission from INI.

The only category of GES work plausibly attributable to defense costs would be the post-June 2003 expenses for "general consulting." But this category of billings is also problematic. It covers a range of tasks that includes subjects covered by the DEC Consent Order, such as communicating with the DEC and local governments and residents, and compiling data, creating maps, responding to FOIA requests, monitoring news coverage, and data input and compilation, as well as – according to Attorney Guttman – assistance with depositions and consultation in the preparation of legal submissions. However, the GES billing records do not specify what if any fees were attributable to each of these functions.

      F.    Conclusions

Accordingly, we conclude that the New Jersey presumption test should be applied to hold that the mitigation expenses are presumed to be indemnity expenses. This holding is consistent with our prior holdings and express the reality that Sunoco employed GES to comply with the DEC PRP letter and Consent Order, not to assist the defense of lawsuits that had not been filed when the bulk of the activity was performed. Sunoco has not rebutted the presumption that the mitigation expenses are indemnity expenses by showing that INI derived an unjust benefit from this allocation. We have already found that the expenses incurred pursuant to the DEC PRP letter and Consent Order cannot qualify as defense costs because administrative proceedings are not "suits" as the term is defined in the policy. The fact that a private party action was filed before GES completed its work to comply with the Consent Order could not transform that work into a defense of the private party suits. For these reasons, we deny Sunoco's motion for summary judgment.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUNOCO, INC., SUNOCO, INC. (R&M), | : | CIVIL ACTION |
| formerly SUN COMPANY, INC. (R&M) | : | |
| | : | |
| V. | : | |
| | : | |
| ILLINOIS NATIONAL INSURANCE | : | |
| COMPANY | : | NO. 04-4087 |

ORDER

**AND NOW**, this  day of August, 2007, upon consideration of Plaintiffs' Motion for Summary Judgment (Docket Entry # 107) and all responses thereto, **IT IS HEREBY ORDERED** that the Motion is **DENIED**.

BY THE COURT:

s/John R. Padova

_____
John R. Padova, J.